695 A.2d 1287

Michael A. PEROUTKA et ux.

v.

Marsha STRENG.

No. 1871, Sept. Term, 1996.

Court of Special Appeals of Maryland.

June 30, 1997.

Thomas A. Pavlinic, Annapolis, for Appellants.

Shelly E. Mintz, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and C.J. Messerschmidt, Assistant Attorney General, on the brief), Baltimore, for Appellee.

Argued before MOYLAN and CATHELL, JJ., and ROSALYN B. BELL, J., (Retired, Specially Assigned).

CATHELL, Judge.

Michael A. and Diane M. Peroutka appeal from the granting of a Motion of Summary Judgment in favor of Marsha Streng, appellee, by the Circuit Court for Baltimore County. This appeal involves an alleged defamatory statement made by appellee to appellant Diane M. Peroutka and her daughter. Appellants present one question on appeal: "Did the circuit court err when it granted [appellee's] Motion for Summary Judgment." We shall affirm.

## The Facts

Prior to her marriage to Michael M. Peroutka, Diane M. Peroutka was married to Scott Hubbard, and two children resulted from Mrs. Peroutka's first marriage: Dawn M. Hubbard and Holly C. Hubbard. In roughly 1978, while the children were still very young, Mr. Hubbard died of leukemia. In August of 1985, Diane M. Peroutka and Michael A. Peroutka were married.

Sometime in 1989, when Dawn was approximately fourteen years old, she began believing that she had been sexually abused by Mr. Peroutka and that she had "repressed" all memory of those events. These memories were allegedly triggered by Dawn's discussions with her deceased father's sister, Marie Hubbard, and the book *Courage to Heal*. Dawn never discussed these allegations of sexual abuse with her family or anyone other than Marie Hubbard until 1992.

In the early part of 1992, Dawn discussed, with members of a youth group and a high school basketball coach, the alleged sexual abuse by Mr. Peroutka. At that time, Dawn was taken to the Child Advocacy Center and, ultimately, the Baltimore County Department of Social Services (BCDSS). The BCDSS conducted an investigation into the alleged abuse and found that Dawn's claims were unsubstantiated.

This, however, did not end Dawn's relations with the BCDSS. Due to these allegations of abuse, Mrs. Peroutka decided to waive her rights as a parent and have Dawn placed with the BCDSS. In May of 1992, Dawn was adjudicated a child in need of assistance and was placed in the custody of the State. At that time, appellee was Dawn's social worker. A few months later, Holly, Dawn's younger sister, was also placed with the BCDSS. Appellee was also Holly's social worker.

Sometime in March or April of 1993, Dawn began to realize that the allegations of sexual abuse were untrue. After working with Dr. McHugh, Dawn realized that she had never been abused by Mr. Peroutka. On 6 April 1994, the allegations of sexual abuse were "ruled out" by the BCDSS.

Despite the false allegations of child abuse, Dawn and appellee continued to communicate. In September of 1994, Dawn received a package from appellee that contained information regarding spousal abuse. At that time, Dawn was a psychology major in her sophomore year of college. A "cover letter" sent along with the materials stated: "I thought you might find some of this interesting—it also might be helpful in psychology class—remember 'battering' doesn't have to be

physical—emotional abuse can be just as devastating." It is important to note that apparently nowhere in this cover letter or the material was it asserted by appellee that appellant was "emotionally abused." It was, by the terms of the cover letter, forwarded for Dawn's interest.[1]

Dawn showed the materials sent by appellee to Mrs. Peroutka on 12 January 1995.[2] On that same day, Mrs. Peroutka confronted appellee regarding the materials. Appellee met with Mrs. Peroutka and Dawn in a BCDSS meeting room. At that meeting, Mrs. Peroutka repeatedly demanded to know whether appellee thought she was an emotionally abused spouse. Appellee eventually responded that she thought Mrs. Peroutka was an emotionally abused spouse. Appellee apparently based her opinion on Mrs. Peroutka's relationship with her daughters. Mrs. Peroutka told appellee that she was not emotionally abused. Appellee responded, "that's good" and left the room. On the following day, appellee called Dawn to apologize for leaving the room in an abrupt manner. During that conversation, appellee again expressed her opinion to Dawn that she thought Mrs. Peroutka was an emotionally abused spouse. Dawn subsequently republished appellee's statement to her sister Holly.

Appellants filed suit against appellee on 19 October 1995. The complaint alleged, in respect to Mr. Peroutka, that appellee's "defamation of [him], consisted of her making, with malice, a false defamatory statement that [he] abused his spouse." Similarly, the complaint alleged, in respect to Mrs. Peroutka, that appellee's "defamation of [her] consisted of [appellee] making, with malice, a false defamatory statement that [she] was a battered spouse."

Appellee filed a Motion for Summary Judgment on 9 September 1996. A hearing on that motion was held on 16 October 1996. At that hearing, the trial court held:

1. There were additional facts brought out below that Dawn had suffered an eating disorder, that criminal trespass charges were filed by appellants against Dawn, etc.

2. Apparently, there had been a reconciliation, of sorts, between the emancipated Dawn and her mother.

The issue in this case is whether, and I would find as a matter of law, I have no difficulty in finding as a matter of law that this statement is not in the least bit defamatory to Mrs. Peroutka. The question is, is the statement defamatory to Mr. Peroutka? Could it be, is it in this case defamation?

. . . .

The question is, is the statement made by Miss Streng at the specific request of Mrs. Peroutka made to Mrs. Peroutka and her daughter, who come to Mrs. Streng's office and who are inviting her to make, give her opinion, can that be construed as defamation to Mr. [Peroutka]?

. . . .

... In my view it is not defamatory. The statement is not defamation. It's an opinion. It's an opinion given at the specific request to give an opinion. That cannot constitute defamation. And it's clear from the authorities, *Potomac Valve & Fitting Incorporated vs. Crawford Fitting Company*, 829 F.2d 1280 [ (4 th Cir.1987) ], that an opinion cannot constitute actionable defamation. *Adler vs. American Standard Corporation*, 538 Fed. Supplement 572 [ (D.Md.1982),] could also be stated as authority.

In my view the statement made by Miss Streng is an opinion. Even if the court were incorrect in stating that the statement was an opinion, the court would have little difficulty in establishing the statement, if it is not an opinion, if it is defamation, which I really don't think it is, if however it were defamation I would rule as a matter of law that the defamation is defamation per quod. . . .

Other facts are necessary to understand the statement as defamatory. Other facts are necessary to understand to even hold the statement to be defamatory. It is not on its face defamatory. And it would be defamation per quod if I thought it were defamatory.

## Summary Judgment

The Court of Appeals has stated that "the proper standard for reviewing the granting of a summary judgment motion should be whether the trial court was legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 592, 578 A.2d 1202 (1990) (citations omitted). The trial court, in accordance with Maryland Rule 2-501(e), shall render summary judgment forthwith if the motion and response show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. The purpose of the summary judgment procedure is not to try the case or to decide factual disputes, but to decide whether there is an issue of fact which is sufficiently material to be tried. *See Coffey v. Derby Steel Co.*, 291 Md. 241, 247, 434 A.2d 564 (1981); *Berkey v. Delia*, 287 Md. 302, 304, 413 A.2d 170 (1980).

In the case *sub judice*, there is no dispute as to the facts. In response to repeated questioning by Mrs. Peroutka, appellee, in the presence of Mrs. Peroutka and Dawn, responded that she thought Mrs. Peroutka was an emotionally abused spouse.[3] This statement was subsequently republished by Dawn to her sister Holly. The only issue is whether the statement made by appellee was defamatory and, if so, whether the statement constituted defamation per quod or defamation per se.

## Discussion

As this appeal concerns one person's right to freedom of speech and another's right to redress when his or her reputation is harmed by unprotected speech, the First Amendment

---

3. Although appellants' complaint stated that appellee stated that Mrs. Peroutka was a battered spouse, Mrs. Peroutka, Dawn Hubbard, and appellee all testified that appellee indicated that she thought Mrs. Peroutka was an emotionally abused spouse.

of the United States Constitution,[4] and Articles Forty[5] and Nineteen[6] of the Declaration of Rights of the Maryland Constitution, are implicated. In *Freedman v. State*, 233 Md. 498, 505, 197 A.2d 232 (1964), *rev'd on other grounds*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the Court of Appeals stated:

> The guaranty of freedom of speech and press ordained in Art. 40 would appear to be, in legal effect, substantially similar to that enunciated in the First Amendment, and it is significant that Art. 40 has been treated by this Court as in *pari materia* with the First Amendment.

*See also Pendergast v. State*, 99 Md.App. 141, 148, 636 A.2d 18 (1994); *Landover Books, Inc. v. Prince George's County*, 81 Md.App. 54, 76, 566 A.2d 792 (1989). We shall, therefore, examine the Supreme Court's decisions for guidance in the case *sub judice*.

In order to protect freedom of the press and freedom of speech, the Supreme Court, beginning with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), made it more difficult for individuals to recover for defamation under state law. In *New York Times*, the Court held that for a public official to recover damages for defamation, he or she had to prove that the statement in regard to his or her official conduct was made with actual malice. This was defined by the *New York Times* Court as knowledge that the statement was false or reckless disregard for the statement's

---

4. The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I.

5. Article Forty of the Declaration of Rights provides: "That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." Md. Const. art. 40.

6. Article Nineteen of the Declaration of Rights provides: "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land." Md. Const. art. 19.

truth or falsity. The Court later held, in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), that the requirement of actual malice also applied to "public figures" and that actual malice had to be proved by clear and convincing evidence in order for a "public official" or "public figure" to recover damages for defamation.

The Supreme Court also addressed the First Amendment's impact on state defamation law for individuals who were not public officials or public figures. In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 31–32, 91 S.Ct. 1811, 1814, 29 L.Ed.2d 296 (1971)(footnote omitted), the Supreme Court examined "whether the *New York Times'* knowing-or-reckless-falsity standard applies in a state civil libel action brought not by a 'public official' or a 'public figure' but by a private individual for a defamatory falsehood uttered in a news broadcast by a radio station about the individual's involvement in an event of public or general interest." In a plurality opinion, the Court indicated that when the matter was of public concern, the plaintiff, even if a private individual, had to show clear and convincing evidence of actual malice.

Three years later, the issue addressed in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974), was "whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements." The Court, in language that is particularly relevant to this case, stated:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339–40, 94 S.Ct. at 3007 (footnote omitted). The Court ultimately held that the states were free to define the standards for defamation of private individuals so long as they did not impose liability without fault and did not "permit recovery

of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349, 94 S.Ct. at 3011.

The Supreme Court further addressed the impact of the First Amendment in a defamation action by a private individual on a matter of private concern in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In that case, the Court addressed whether the *Gertz* standard applied to a private individual defamed on a matter of private concern. In a plurality opinion, the Court held it did not. It stated: "[W]e hold that the state interest adequately supports awards of presumed and punitive damages—even absent a showing of 'actual malice.'" *Dun & Bradstreet*, 472 U.S. at 761, 105 S.Ct. at 2946 (footnote omitted). The Court, in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986), explained its holding in *Dun & Bradstreet:*

> When the speech is of public concern but the plaintiff is a private figure, as in *Gertz*, the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in *Dunn [Dun] & Bradstreet*, the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape.

The plurality opinion in *Dun & Bradstreet* is particularly relevant in the case *sub judice* as we are dealing with the alleged defamation of a private individual on an exclusively private concern. It is, therefore, clear that if the statement made by appellee could be construed as being defamatory, many of the protections afforded defendants in regard to speech concerning matters of public concern and public figures or public officials may not be applicable unless afforded by Maryland law. We shall discuss Maryland law after discussing a more recent Supreme Court case that dealt with the Constitutional protection afforded to statements of opinions.

As we have previously mentioned, dicta in the Supreme Court's *Gertz* opinion implied that opinions were protected by the First Amendment. As a result, the lower federal courts and state courts formulated various tests in order to determine whether the speech in issue constituted a statement of fact or opinion. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 10, 110 S.Ct. 2695, 2701, 111 L.Ed.2d 1 (1990), the Supreme Court addressed whether statements of opinion were constitutionally excepted by the First Amendment from the application of state defamation laws. The Court ultimately held: "We are not persuaded that, in addition to [the already existing constitutional] protections, an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment." *Id.* at 21, 110 S.Ct. at 2707.

We shall discuss *Milkovich* in more detail after discussing Maryland defamation law and Maryland law in respect to Constitutional protections afforded to statements of opinion. In *Shapiro v. Massengill*, 105 Md.App. 743, 772, 661 A.2d 202, *cert. denied*, 341 Md. 28, 668 A.2d 36 (1995), we stated:

In a case involving a plaintiff who is not a public figure, a prima facia case of defamation requires proof of the following elements:

(1) that the defendant made a defamatory communication—i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement as being defamatory; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm.

As to the first element, the determination of whether a statement "is reasonably capable of a defamatory interpretation is for the court upon reviewing the statement as a whole; words have different meanings depending on the context in which they are used and a meaning not warranted by the

whole publication should not be imputed." *Batson v. Shiflett,* 325 Md. 684, 723, 602 A.2d 1191 (1992); *see also Chesapeake Publishing Corp. v. Williams,* 339 Md. 285, 295, 661 A.2d 1169 (1995) (quoting *Batson*).

▆▆ We agree with the trial court that the statement was not defamatory as to Mrs. Peroutka. Asserting that a person is emotionally abused is not the type of statement "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Batson,* 325 Md. at 722–23, 602 A.2d 1191.

The more difficult question is whether the statement is defamatory as to Mr. Peroutka. Although it might be argued that the deceased first husband was the implied abusive spouse under the circumstances here present, the parties assumed that any implication as to the identity of the abuser would relate to Mr. Peroutka. The assertion that Mrs. Peroutka is an emotionally abused spouse, therefore, may imply that Mr. Peroutka is the abusing spouse. For purposes of this opinion, we shall assume, without deciding, that an assertion that a person emotionally abuses his or her spouse carries with it a defamatory meaning.[7] The issue then becomes,

---

7. We are not altogether persuaded that alleging one is an emotional abuser is the type of statement that would "expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Batson,* 325 Md. at 722–23, 602 A.2d 1191. We find it very difficult to ascertain what type or degree of conduct constitutes emotional *abuse.* Many human contacts are of an emotional nature—love, hate, concern, worry; the list is extensive. When they are of an impermissible nature, so as to constitute abuse, might, in many instances, be especially difficult to determine. There are no sharp delineations, such as usually exist in cases of physical or sexual abuse, in emotional abuse situations. The existence or nonexistence of emotional abuse may be clear at either end of the processes of personal interactions between people, but, as the personal interactions leave the good or bad extremes of conduct, much of the area between is of an opaque or murky nature. We note that even professionals in the psychiatric community have a difficult time ascertaining what type or degree of conduct rises to the level of emotional abuse. Dr. Paul R.

whether, under the circumstances of this case, appellee's statement that she thought Mrs. Peroutka was an emotionally abused spouse was defamatory to Mr. Peroutka.

We note initially that appellee's statement was given as an opinion upon Mrs. Peroutka's demand that appellee render an opinion. In the resolution of this case, we shall first examine Maryland cases dealing with opinion and then discuss the impact of the Supreme Court's holding in *Milkovich*.

In *A.S. Abell Co. v. Kirby*, 227 Md. 267, 176 A.2d 340 (1961), a case decided before *Gertz* and *New York Times*, the Court of Appeals addressed the defense of fair comment. In that case, at a hearing to remove the Police Commissioner of Baltimore City, the plaintiff testified that he had seen the commissioner with " . . . an underworld figure and two girls from 'the Block' . . . ." *Id.* at 270. The next day, the defendant newspaper published the following paragraph that was allegedly defamatory:

> "Every important witness against the Police Commissioner, moreover, was a man with a motive. We name especially the infamous Kirby, former Inspector Forrester, and former Chief Inspector Ford whose retirement was requested and granted some time ago with dazzling haste."

*Kirby*, 227 Md. at 271, 176 A.2d 340. The Court first stated the applicable law:

> Whether a publication claimed to come within the protection of fair comment is actionable often turns on whether or not it contains misstatements of fact as distinguished from expression of opinion. The majority of the States (perhaps

---

McHugh, M.D., the Psychiatrist–in–Chief at Johns Hopkins Hospital, stated in his affidavit:

> Emotional abuse is not a diagnosis—it is merely an opinion or an assessment. There is no listing for emotional abuse or excessive emotional coercion or pressure in the Diagnostic and Statistical Manual of Mental Disorders -IV (DSM–IV). There are no defined set of clinically significant behavioral or psychological syndromes or patterns that occur in an individual that is associated with subjection to excessive emotional pressure, emotional coercion, or, as a layperson might state, emotional abuse.

three-fourths) hold that the immune instances of public discussion are those limited to opinion, comment, and criticism, and do not embrace those in which there is any false assertion of defamatory fact. . . .

Maryland has consistently followed the majority rule—that defamatory misstatement of fact cannot be defended successfully as fair comment. The distinction between "fact" and "opinion," although theoretically and logically hard to draw, is usually reasonably determinable as a practical matter: Would an ordinary person, reading the matter complained of, be likely to understand it as an expression of the writer's opinion or as a declaration of an existing fact? An opinion may be so stated as to raise directly the inference of a factual basis, and the defense of fair comment usually has been held not to cover an opinion so stated.

*Id.* at 273–74, 176 A.2d 340 (citations omitted). On appeal, the publisher of the statement argued that the trial court erred in giving instructions to the jury because it failed to instruct the jury that it could consider all of the plaintiff's activities and the investigations into the plaintiff's activities in order to determine whether the statement was defamatory. The Court, after citing various commentators, stated:

We think that to sustain fair comment, facts which are set out in the publication must be truly stated (if they are unprivileged), and that such a fact which is not set out must both be true and be so referred to in the publication as to be either recognizable or be made identifiable and easily accessible.

*Id.* at 282, 176 A.2d 340. The Court ultimately held that the publisher did not set out the facts sufficiently in the editorial or reference them so as to inform a reader of the facts upon which the publisher based the opinion.

One year after *Gertz* was decided by the Supreme Court, we examined the protections afforded expressions of opinion in *Kapiloff v. Dunn*, 27 Md.App. 514, 343 A.2d 251 (1975), *cert. denied*, 276 Md. 741, *and cert. denied*, 426 U.S. 907, 96 S.Ct.

2228, 48 L.Ed.2d 832 (1976). In that case, the Montgomery County Sentinel published an article that rated various high school principals in the area. The source material for the article was included along with the publication. One of the principals, who received an "unsuited" rating, sued in defamation the owners of the newspaper, the newspaper's editor, and the reporters who wrote the story. After the defendants moved unsuccessfully for a directed verdict, the jury found in favor of the plaintiff. The publisher appealed, claiming that the rating was an expression of opinion that could not be the basis for a libel action.

After discussing *Kirby, supra,* and the dicta in *Gertz* that we have previously quoted, we stated:

> We take it that appellants contend that by creating a constitutional qualified privilege for false statements of fact, the Supreme Court immunized all expressions of opinion about individuals in the public official-public figure classification.
>
> We do not read the Supreme Court decisions so broadly. Except for dictum in *Gertz,* nothing in *New York Times* or its progeny indicates that the Court has created an absolute privilege for all expressions of opinion on public matters and therefore eliminated the defense of "fair comment."

*Kapiloff,* 27 Md.App. at 528–29, 343 A.2d 251 (footnote omitted). We ultimately held that

> expressions of opinion, as well as statements of fact, concerning public officials and public figures can be actionable. Each, however, is under the protection of the constitutional privilege of *New York Times.* True statements of facts concerning the conduct of public figures are absolutely privileged. *A.S. Abell Co. v. Barnes, supra* [258 Md.] at 59 [265 A.2d 207 (1970)]. False statements of fact are protected if not knowingly false or not published with reckless disregard of their truth or falsity. Fair and honest opinions which are based upon *true* facts and which have some relation to or connection with those facts are also absolutely privileged. Opinions based on false facts are protected if

the publisher was not guilty of actual malice with regard to these supportive facts.

... Where the statements, however, are actual expressions of opinion, based upon stated or readily known facts, their objective truth or falsity depends on the veracity of these underlying facts. Therefore, any determinations with regard to falsity or the presence of actual malice must look to the stated or known facts which form the basis for the opinion....

*Kapiloff,* 27 Md.App. at 531–33, 343 A.2d 251 (footnotes omitted). In a footnote in the text quoted above, we stated:

We preserve the distinction between assertions of fact on one hand and opinions, comments and criticism on the other hand because fair and honest commentary, by its very nature, deserves special protection in a free society. As [1] Harper & James[, *The Law of Torts* ] § 5.28 at 458 [ (1954) ] point out, an individual is not actually libelled by opinions based on supporting facts: "If the actual facts are accurately stated, an opinion, based thereon will be understood as such and taken for what it is worth. In such a case the writer may, by expressing his opinion, 'libel himself rather than the subject of his remarks'."

*Kapiloff,* 27 Md.App. at 531 n. 19, 343 A.2d 251. We ultimately held that the case should not have been submitted to the jury because the plaintiff could not prove by clear and convincing evidence that the underlying facts in the article were false and that the defendants knew the statements were false or recklessly disregarded their truth or falsity.

The Court of Appeals addressed the rendering of a professional opinion in *Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980). The plaintiff, a police officer, stopped the defendant, Mr. Berkey, for exceeding the maximum speed limit. As a result of that incident, Mr. Berkey, a psychiatrist, wrote a letter on his professional letterhead to the plaintiff's supervisor. In that letter, Mr. Berkey gave some background information regarding the stop and then concluded: "I question if

this young officer is mentally deranged, if he is psychopathic and/or pathologically sadistic." *Id.* at 308, 413 A.2d 170.

Although the Court questioned whether the police officer was a public official, it proceeded under the assumption that he was. After holding that some of the facts in the case were in dispute, it stated:

> It is apparent that Berkey regards Delia's "behavior as abnormally cruel and inhumane, rude and insensitive, threatening and punitive" upon the basis of his own observation of this incident. If the trier of fact were to determine that Berkey spoke a calculated untruth in giving his version of the incident, the version which is the basis for Berkey's conclusion relative to Delia's mental condition, then a trier of fact could conclude that Berkey spoke with reckless disregard for the truth when he used the adjectives which he did to characterize Delia's behavior on this occasion.

*Id.* at 330, 413 A.2d 170.

The Court of Appeals addressed a private individual's action for libel based on an opinion in *Hearst Corp. v. Hughes,* 297 Md. 112, 466 A.2d 486 (1983). In that case, Dawn Rottman purchased an automobile from an auto dealership in July 1975. Almost immediately, Rottman experienced problems with the automobile. In August of 1975, the automobile dealership from which the car was purchased was sold to another company. The plaintiff was employed by that company as its operating manager. Rottman's automobile was taken to the dealership on numerous occasions to try to fix it. During a test drive on 29 June 1977, the automobile was found to be functioning properly. On 22 July 1977, the car's engine stopped and never again functioned.

As a result of her dealings with the dealership, Rottman wrote a letter that was read on a television station owned by the defendant. In that letter, she indicated that she purchased the car from the plaintiff, that the plaintiff had explained to her the dealership's "great" buyer protection plan, and that the automobile was never properly fixed. She concluded in the letter, "Mr. Hughes, here's one person you could

offer a camera and calculator to and I still wouldn't buy another AMC product." *Id.* at 116, 466 A.2d 486.

The plaintiff, asserting that the broadcast had disparaged his reputation in his trade, business, or employment, sued the television station for defamation. The trial court ruled in his favor. On appeal, the defendant argued that "there is an absolute privilege for the publication of opinions which disclose the facts upon which they are based." *Id.* at 131, 466 A.2d 486. The Court cited section 566 of the Restatement (Second) of Torts, which provides: " 'A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.' " *Id.* The defendant argued that Rottman was expressing her opinion concerning the automobile and the protection plan, not the plaintiff, and that she explained the facts underlying her opinion. The Court held that section 566 of the Restatement (Second) of Torts, even if it reflected Maryland law, was not applicable because the opinion concerned the plaintiff and was based on false facts in that he did not sell the automobile to Rottman and he was not connected with the dealership at the time of most of the attempted repairs.

We addressed a similar issue as that addressed by the Court of Appeals in *Berkey* in *Hughley v. McDermott*, 72 Md.App. 391, 530 A.2d 13 (1987), *aff'd*, 317 Md. 12, 561 A.2d 1038 (1989). In that case, the plaintiff was a candidate for the position of Park Police Officer with the Maryland–National Capital Park and Planning Commission (MNCPPC). As part of his training, the plaintiff trained with a horse-mounted unit even though he expressed his desire not to train with such a unit. While undertaking this training, the plaintiff experienced nausea and mild stomach problems. The MNCPPC eventually requested that the plaintiff meet with the defendant, a psychologist, who consulted the MNCPPC and provided counseling services to its employees. At that meeting, the defendant told the plaintiff that he believed the plaintiff had a phobia of horses and that he did not think the plaintiff had an

authority problem. The defendant recommended hypnosis treatment that the plaintiff indicated he was unwilling to undertake. At a later meeting with the plaintiff's superiors and the plaintiff, the defendant stated that he thought the plaintiff's phobia was real and suggested that the plaintiff had consented to hypnosis to treat this phobia. The plaintiff interjected at that point and indicated that he would not undertake hypnosis therapy. A few days later, the defendant wrote one of the plaintiff's superiors a letter in which he stated that the plaintiff did not suffer from a phobia of horses and that the physical symptoms he experienced were "false and grossly exaggerated." *McDermott*, 72 Md.App. at 398, 530 A.2d 13. The letter was followed by a supplemental correspondence that gave the defendant's findings in more detail.

The trial court granted summary judgment in favor of the defendant. On appeal, the defendant argued that "his letters ... contained only expressions of his opinions following his professional evaluation of the [plaintiff]." *Id.* at 403, 530 A.2d 13. After citing *Berkey, supra,* we stated:

Comment c. to § 566 of the Restatement (Second) of Torts (1976) points out that a defamatory communication may consist of a statement in the form of an opinion where the defendant bases his expression of a derogatory opinion on his own statement of false and defamatory facts. In the case *sub judice* the record before the hearing judge would support a finding by the trier of fact that the statements of the [defendant], although couched as expressions of opinion, were calculated untruths which adversely affected the [plaintiff's] employment and were therefore defamatory.

*Id.* at 404–05, 530 A.2d 13 (citations omitted).

A review of the Maryland cases indicates that a statement, even if expressed in terms of an opinion, can be defamatory under certain circumstances regardless of whether the statement concerns a public figure or private person. When the underlying facts used to form the opinion are not given along with the defamatory statement, the statement

itself may be treated as being factual and therefore potentially defamatory. *See Kirby,* 227 Md. at 282, 176 A.2d 340. If the facts from which an individual forms a conclusion are given but are false, the defendant is potentially subject to liability for defamatory speech based on the false statement of facts. *See Hearst Corp.,* 297 Md. at 131–32, 466 A.2d 486; *Berkey,* 287 Md. at 330, 413 A.2d 170; *Hughley,* 72 Md.App. at 405, 530 A.2d 13. If the facts from which a defendant forms his or her opinion are given or are readily available and those facts cannot be proved false, the defendant is not subject to liability for the opinion. *See Kapiloff,* 27 Md.App. at 532 n. 19, 343 A.2d 251.

We shall now examine *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), in order to determine whether the views expressed by the Supreme Court are in accord with Maryland law. In *Milkovich,* the plaintiff was a high school wrestling coach. During a wrestling match with another school, his team was involved in an altercation that resulted in numerous injuries. The state athletic association held a hearing and, after hearing testimony from the plaintiff and others, placed the team on probation for one year and forbid the team from participating in the state tournament. Several parents of wrestlers then sued the state athletic association seeking a restraining order against the association's ruling. At that trial, the plaintiff again testified. The newspaper published an article the next day that indicated the plaintiff had committed perjury by giving false testimony at trial. The plaintiff brought suit against a newspaper and a reporter for defamation based on the article.

The Court, after quoting from section 566 of the Restatement (Second) of Torts and examining its previous decisions regarding the constitutional protections afforded by the First Amendment, held that there is no "wholesale defamation exemption for anything that might be labelled 'opinion.' " *Id.* at 18, 110 S.Ct. at 2705. The Court noted:

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the

facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* at 18–19, 110 S.Ct. at 2705–06.

The Court held that opinions were adequately protected by existing constitutional doctrine and that there was no need to create a distinction between opinion and fact. The first protection noted by the Court was that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Id.* at 19, 110 S.Ct. at 2706. It went on to state:

[U]nlike the statement, "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," would not be actionable.

*Id.* at 20, 110 S.Ct. at 2706. In a footnote, the Court stated:

We note that the issue of falsity relates to the *defamatory* facts implied by a statement. For instance, the statement "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to establish malice....

*Id.* at 20 n. 7, 110 S.Ct. at 2706 n. 7.

The Court also noted that opinions were protected by the line of cases holding that "imaginative expression" or "rhetorical hyperbole" is protected under the First Amendment. Further protection was afforded by the culpability requirements of *New York Times* and *Gertz.* Finally, the Court noted that these statements were protected by the enhanced appellate review mandated by *Bose Corp. v. Consumers Union of the*

*United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

The *Milkovich* Court framed the issue in regard to whether the statement was defamatory as "whether a reasonable fact-finder could conclude that the statements in the . . . column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding." *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707. The Court concluded that the connotation that Milkovich perjured himself was sufficiently factual to be susceptible of being proved true or false. Additionally, the Court indicated that the protections provided by the other cases were not applicable.

The Maryland Court of Appeals discussed *Milkovich* in *Batson v. Shiflett,* 325 Md. 684, 602 A.2d 1191 (1992). That case involved a former local union's president's defamation suit against a national union and its president. The alleged defamatory statement was set out in a flyer that was distributed by the national union to the local union's members. The flyer provided:

"[W]e think that you ought to answer these specific charges because all of the checks paid to Harmon were signed by you. If Harmon is guilty of misuse of the locals [sic] funds then you may be too. A point of interest is that we have just started checking Alvin Shiflett's gas receipts and have already found Mrs. Schiflett charging gas to the local." *Id.* at 723, 602 A.2d 1191.

The *Batson* Court addressed the petitioners' argument that "their statements in [the] Flyer . . . are immunized as an expression of opinion constitutionally protected in the absence of 'actual malice.' " *Id.* at 724, 602 A.2d 1191. Citing section 566 of the Restatement (Second) of Torts, the Court noted that expressions of opinion could be actionable. The Court of Appeals further noted that the Supreme Court in *Milkovich* "warned about creating a 'wholesale defamation exemption for anything that might be labelled "opinion." ' " *Id.* (citing *Milkovich,* 497 U.S. at 18, 110 S.Ct. at 2705). It ultimately concluded that the language used in the flyer was not figura-

tive or hyperbolic language and was therefore capable of defamatory meaning. Although the *Batson* Court did not address whether the statement could be proved true or false, it is clear that the assertions in the flyer were capable of verification.

As we view the case *sub judice*, the ultimate issue revolves around the verifiability of the alleged defamatory statement. Section 566 of the Restatement (Second) of Torts, cited by the Court in *Milkovich*, provides:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implied the allegation of undisclosed facts as the basis for the opinion.

The Restatement distinguishes between "pure" opinion and "simple" opinion. A pure opinion is based on disclosed or known facts while a simple opinion is based on undisclosed facts. The Restatement divides the rule into four fact patterns:

> (1) If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of false and defamatory facts, he is subject to liability for the factual statement but not for the expression of opinion.

> (2) If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the factual statement—nor for the expression of opinion, so long as it does not reasonably indicate an assertion of the existence of other, defamatory, facts that would justify the forming of the opinion. The same result is reached if the statement of facts is defamatory but the facts are true ... or if the defendant is not shown to be guilty of the requisite fault regarding the truth or defamatory character of the statement of facts....

> (3) If the defendant bases his expression of a derogatory opinion on the existence of "facts" that he does not state but that are assumed to be true by both parties to the communication, and if the communication does not give rise to the

reasonable inference that it is also based on other facts that are defamatory, he is not subject to liability, whether the assumed facts are defamatory or not.

(4) If the defendant expresses a derogatory opinion without disclosing the facts on which it is based, he is subject to liability if the comment creates the reasonable inference that the opinion is justified by the existence of unexpressed defamatory facts.

Restatement (Second) of Torts § 566 cmt. c (1976).

Although the rule set out in the Restatement at first glance may seem to contradict the analysis established by the Supreme Court in *Milkovich*, upon further analysis the two can be construed to be consistent. The Court in *Milkovich* addressed a newspaper article that implied the plaintiff had perjured himself. That article, however, did not provide all of the facts from which the conclusion was drawn. Of the four fact patterns provided by the Restatement, *Milkovich* clearly fits into number four, the one in which no facts are disclosed. Under the circumstances of fact pattern number four, if the opinion is found to be false, liability is imposed. The facts in *A.S. Abell Co. v. Kirby*, 227 Md. 267, 176 A.2d 340 (1961), also illustrate the application of this rule.

We are further persuaded that the analysis in *Milkovich* and the Restatement are consistent by examining the second fact pattern of the Restatement and an example given by the *Milkovich* Court. Fact pattern number two of the Restatement provides that a defendant is not subject to liability if he or she bases a derogatory opinion on his or her own statement of facts that are not defamatory. The *Milkovich* Court stated: "Thus, unlike the statement, 'In my opinion Mayor Jones is a liar,' the statement, 'In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin,' would not be actionable." *Milkovich*, 497 U.S. at 20, 110 S.Ct. at 2706. In this example, the Supreme Court assumed that the factual assertion that Mayor Jones accepted the teachings of Marx and Lenin was true. As these examples show, when the facts for the bases of the opinion are given and

the underlying facts are true or the required fault cannot be shown, the defendant is not subject to liability. The Maryland case of *Kapiloff v. Dunn*, 27 Md.App. 514, 343 A.2d 251 (1975), is illustrative of the second fact pattern of the Restatement.

Under the first fact pattern of the Restatement, liability is imposed on a defendant if he or she bases the opinion on his or her statement of false facts. The Maryland cases of *Hearst Corp. v. Hughes*, 297 Md. 112, 466 A.2d 486 (1983), *Berkey v. Delia*, 287 Md. 302, 413 A.2d 170 (1980), and *Hughley v. McDermott*, 72 Md.App. 391, 530 A.2d 13 (1987), are illustrative of the first fact pattern of the Restatement.

■ In the case *sub judice*, appellee did not base her opinion that Mrs. Peroutka was an emotionally abused spouse on facts disclosed in the opinion. Accordingly, this case is not similar to fact patterns number one or two of the Restatement. Although Maryland cases have addressed factual patterns similar to fact patterns 1, 2, and 4 of comment c to section 566 of the Restatement (Second) of Torts, we have not addressed whether a defendant should be held liable for an opinion that was based on facts known by the persons to whom the statement was published.

We shall hold, under the circumstances of this case, that appellee's statement was not defamatory. We explain.

The alleged defamatory statement was published to four persons: Mr. Peroutka, Mrs. Peroutka, Dawn, and Holly. All of these persons had firsthand knowledge of the facts that led appellee to form an opinion that Mrs. Peroutka was an emotionally abused spouse. In this context, it was evident that appellee was expressing an opinion. Comment b to section 566 of the Restatement provides:

> The pure type of expression of opinion may also occur when the maker of the comment does not himself express the alleged facts on which he bases the expression of opinion. This happens when both parties to the communication know the facts or assume their existence and the comment is clearly based on those assumed facts and does

not imply the existence of other facts in order to justify the comment.

In the case *sub judice,* Mr. and Mrs. Peroutka, Dawn, Holly, and appellee knew that (1) Mrs. Peroutka had placed both Holly and Dawn in the custody of the BCDSS; (2) appellee was the foster care worker for both Dawn and Holly; (3) as Dawn's and Holly's social worker, appellee received information concerning their feelings and their family's interaction; (4) appellee had the opportunity to observe Mr. and Mrs. Peroutka's behavior in relation to Holly and Dawn; (5) when Dawn indicated that she thought she was sexually abused by Mr. Peroutka, Mrs. Peroutka wrote numerous letters to friends and acquaintances of the family that divulged personal and embarrassing information about Dawn; (6) Mr. and Mrs. Peroutka filed a Motion for a Restraining Order when Dawn went to visit her half-sibling shortly after she was placed in foster care; (7) neither Mr. Peroutka nor Mrs. Peroutka visited Dawn while she was hospitalized for a severe eating disorder; and (8) when Dawn went to deliver a letter to Mr. and Mrs. Peroutka, in which she recanted her allegations of sexual abuse, a complaint for criminal trespass was filed against her. Because all the persons who received the alleged defamatory statement knew the underlying facts of the conflicts within this family unit giving rise to appellee's opinion, appellee is not subject to liability, although, as with any opinion, appellant is free to disagree.

We hold that the statement made by appellee was not defamatory as to either Mr. or Mrs. Peroutka. We, accordingly, affirm the grant of summary judgment by the trial court.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**